UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CATHERINE P. ALFORD, ET AL.                CIVIL ACTION


VERSUS                                     NO: 13-5457
                                           REF: 13-5464


CHEVRON U.S.A. INC., ET AL.                SECTION: R



**ORDER AND REASONS**

Defendant Exxon Mobil Corporation moves to dismiss several of plaintiffs' claims against it.[1]  Defendants Chevron U.S.A. Inc., Chevron Pipe Line Company, and Gulf Oil Corporation (collectively "Chevron") also move to dismiss several of plaintiffs' claims against them.[2]  For the following reasons, the Court grants Exxon's motion in part and denies it part, and grants Chevron's motion.


I.   **BACKGROUND**

   A.   **Procedural History**

This "legacy litigation" lawsuit centers on property that plaintiffs allegedly own and/or use in Township 18 South, Range

---

[1]     R. Doc. 167.

[2]     R. Doc. 177.

15 East, Plaquemines Parish, Louisiana, in the Potash Field,[3] which defendants allegedly harmed with their oil and gas exploration and production activities.[4]  On May 2, 2013, plaintiffs brought a host of claims in Louisiana state court based on these alleged harms; defendants removed the suit to this Court several months later.[5]  The Louisiana Supreme Court has dubbed this type of lawsuit "legacy litigation" because it "arise[s] from [oilfield] operations conducted many decades ago" that left "an unwanted 'legacy' in the form of actual or alleged contamination."  *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 238 n.1 (La. 2010) (citing Loulan Pitre, Jr., *"Legacy Litigation" and Act 312 of 2006*, 20 Tul. Envt. L.J. 347, 348 (2007)).

The motions currently before the Court are second round motions to dismiss.  The Court issued an earlier order[6] in which it dismissed all of plaintiffs' claims against Chevron except for their claims under Civil Code articles 2683(2), 2686, and 2692, and Mineral Code articles 11 and 122.  In that order, the Court

---

[3]  *Alford et al. v. Chevron U.S.A. et al.*, No. 2:13-cv-5464, R. Doc. 1-3 at 25.

[4]  *Id.* at 24.

[5]  *Alford et al. v. Chevron U.S.A. et al.*, No. 2:13-cv-5464, R. Doc. 1.  In September 2013, the Court consolidated this action with Civil Action Nos. 13-5457, *Alford, et al. v. Chevron U.S.A. Inc., et al.*, and 13-5703, *Alford, et al. v. Anadarko E&P Onshore, LLC, et al*. R. Docs. 21 & 35.  The Court remanded the lead case, No. 13-5457, to Louisiana state court on January 6, 2014.

[6]  *See* R. Doc. 161.

2

also accepted plaintiffs' concession that Chevron had not
conducted any operations on or near plaintiffs' property and that
plaintiffs had not alleged any specific conduct by Chevron in
their complaint.   The order also dismissed all of plaintiffs'
claims again Exxon except for the following claims:

- Claims for breach of implied obligations owed by
  mineral lessees under La. Civ. Code arts. 2683(2),
  2686, and 2692, and Mineral Code articles 11 and 122
- Claims for breach of implied obligations owed by
  servitude holders under La. Civ. Code arts. 576 and 577
- A negligence claim under La. Civ. Code art. 2315 and a
  claim under § 324A of the Restatement (Second) of
  Torts, as interpreted by Louisiana jurisprudence
- A trespass claim
- A claim under La. Civ. Code art. 667, which restricts
  the manner in which neighbors may use their property

At issue in the motions to dismiss now before the Court is
whether plaintiffs have successfully re-pled two claims against
Chevron and three claims against Exxon that the Court dismissed
in the earlier order: (1) a claim against Chevron and Exxon for
damages for land loss, subsidence, and backfilling of canals;[7]
(2) a claim that Chevron and Exxon are strictly liable for
violations of Civil Code article 667[8] and of Civil Code articles
2317 and 2322;[9] and (3) a claim against Exxon for punitive
damages under former Civil Code article 2315.3 for wanton or

---

[7]   R. Doc. 164 at 3-4.

[8]   *Id.* at 4-5.

[9]   *Id.* at 5-6.

reckless conduct in connection with the handling of hazardous and toxic substances.[10]

After examining the allegations relevant to these claims, the Court determines that plaintiffs have succeeded in pleading their claim against Exxon for punitive damages under former article 2315.3, but only for damages relating to well serial number 93246 for operations that occurred during the period when article 2315.3 was in effect.  Plaintiffs' other claims against Chevron and Exxon fail for the reasons set out in this order.

## B.   1950 Mineral Lease, 1960 Servitude, and Operator History

Plaintiffs attached to their original complaint several documents relating to mineral operations in the Potash field.[11] These documents include an "Oil, Gas, and Mineral Lease" on the subject property in the name of Humble Oil & Refining Company (alleged predecessor-in-interest to Exxon) and Gulf Refining Company (alleged predecessor-in-interest to Chevron), dated December 14, 1950,[12] as well as various amendments to and conveyances of the 1950 lease.[13]  The Mineral lease "grants,

---

[10]    *Id.* at 7-10.

[11]    *See Alford et al. v. Chevron U.S.A. et al.*, No. 2:13-cv-5464, R. Doc. 1-3 at 26 (alleging that the attached documents "describe[] the defendants' relationship to each other, to the wells, and to the property in question"); *see also id.* at 47-89.

[12]    *Id.* at 47-48.

[13]    *Id.* at 49-70.

leases, and lets" the Potash field to Exxon's and Chevron's predecessors-in-interest

> for the purposes of investigating, exploring, prospecting, drilling and mining for and producing oil [and] gas, laying pipe lines, building . . . structures thereon to produce, save, take care of, treat, transport and own said products and for housing its employees, and **for dredging and maintaining canals**, constructing and maintaining roads and bridges, and, in general, for all appliances or structures, equipment, servitudes and privileges which may be necessary, useful or convenient to or in connection with any such operations conducted by Lessee . . . .[14]

The documents attached to the complaint also include evidence of a servitude granted to Humble Oil on the property, dated February 17, 1960[15] and documentation of Humble Oil's merger into Exxon in 1973.[16]  The servitude agreement grants Humble Oil two pipeline servitudes "twenty (20) feet in width" "to lay, maintain, operate, replace, change and remove any and all pipe lines for the transportation of oil, gas and/or water and/or their products, with all incidental equipment."[17]  The two pipeline servitudes were to follow two routes across the property that are described using coordinates in the servitude agreement and illustrated in a diagram attached to the servitude

---

[14]    *Id.* at 47 (emphasis added).

[15]    *Id.* at 71-77.

[16]    *Id.* at 78-89.

[17]    *Id.* at 71.

agreement.[18]  The servitude agreement also grants Humble Oil a servitude "over, across and through" an irregularly shaped portion of the Potash field, which is described by coordinates in the servitude agreement and illustrated in a diagram attached to the servitude agreement.[19]  Within this irregularly shaped portion of the Potash field, the servitude permitted Humble Oil

> to install, maintain, operate, replace, change and remove pipe lines, tanks, tank batteries, compressors, dehydration facilities and appurtenances for the treating, transportation and storage of oil, gas, . . . and other minerals . . . , and/or their products; **and to dredge, dig, maintain and use canals together with the right to deposit spoil along side of same**; and to build, maintain, use and operate any other facilities and appurtenances useful and convenient to Grantee's general business.[20]

Because plaintiffs have alleged no facts plausibly suggesting that there are any other leases, servitudes, or other agreements applicable to the property, the Court limits its focus in this order to the 1950 mineral lease and the 1960 servitude agreement.

Plaintiffs have also attached to the complaint the Operator History of the property.[21]  That document reflects that Humble Oil and Exxon have operated two different wells on plaintiffs' property.[22]  Operations on well number 46753 were permitted on

---

[18]   *Id.* at 71 and 74.

[19]   *Id.* at 71, 72 & 74.

[20]   Id. at 71 (emphasis added).

[21]   *See id.* at 4.

[22]   *Id.* at 11.

September 11, 1952, and concluded on December 28, 1973, when the well was plugged and abandoned.[23]  Operations on well number 93246 were permitted on November 14, 1962, and concluded on October 23, 1985, when that well also was plugged and abandoned.

## II.  LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

A legally sufficient complaint must establish more than a "sheer possibility" that the plaintiff's claim is true.  *Id.*  It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action.  *Id.*  In other words, the face of

---

[23]    *Id.*

the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 257. If there are insufficient factual allegations to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the claim must be dismissed. *Twombly*, 550 U.S. at 555.

## III. DISCUSSION

### A.   Claim for Damages for Canal Backfilling and Remediation

Exxon and Chevron move the Court to dismiss again plaintiffs' claim for "damages for land loss, subsidence, and the cost of backfilling of canals and other excavations."  In the Court's earlier order addressing Chevron's and Exxon's first round of motions to dismiss, the Court dismissed this claim for two reasons.  First, the Court found that plaintiffs had not alleged any facts indicating that their property had actually suffered land loss or subsidence.  Second, plaintiffs did not identify and the Court could not find any source in contract or state or federal law imposing a duty on defendants to conduct the sort of remediation that plaintiffs claimed was owed.

Plaintiffs now attempt to remedy the first problem by alleging that

> [t]he dredging of canals through petitioners' property has had a direct and significant impact on that property. . . . [T]he defendants failed to design or construct said

8

> canals using the best practical techniques to prevent bank slumping, erosion, and saltwater intrusion.  As a result, the defendants' oil and gas exploration and production activities including, but not limited to, dredging activities have resulted in the degradation of the petitioners' property.  The defendants have failed to revegetate, refill, clean, detoxify, or otherwise restore the canals on the petitioners' property.[24]

Plaintiffs have thus alleged that canals were dredged, and that as a result, their property was "degrad[ed]."  Plaintiffs fail, however, to identify a source in contract or state or federal law for defendants' alleged duty to "us[e] the best practical techniques to prevent bank slumping, erosion, and saltwater intrusion" when dredging, or to "revegetate, refill, clean, detoxify, or otherwise restore" the dredged canals.

In their briefing, plaintiffs point to the Louisiana Civil Code and Mineral Code provisions governing the implied obligations of mineral lessees and servitude holders as potential sources for their claim for "damages for land loss, subsidence, and the cost of backfilling of canals and other excavations."  The Court thus construes plaintiffs' new paragraph about canal dredging as an attempt to state a claim for damages for canal backfilling and remediation under the 1950 mineral lease and/or the 1960 mineral servitude, and the Civil Code and Mineral Code provisions relevant to each contract.  Because neither agreement provides a right to this kind of remediation, implied or

---

[24]    R. Doc. 164 at 3-4.

otherwise, plaintiffs' claim for canal backfilling and remediation damages must be dismissed.

      1.    *1950 Mineral Lease; Civil Code articles 2683, 2686, 2688, and 2692; and Mineral Code articles 11 and 122*

In Louisiana, the restoration obligation of mineral lessees is governed by the codal provisions concerning implied obligations of lessees: Civil Code articles 2683, 2686, 2688, and 2692, which regulate the obligations of the lessor and the lessee; Mineral Code article 11, which describes the correlative rights of landowners and owners of mineral rights; and Mineral Code article 122, which concerns a mineral lessee's obligation to act as a reasonably prudent operator. Together, these provisions establish that mineral lessees have a duty to restore property to its original condition, minus normal wear and tear, at the conclusion of the lease, and to refrain from using the property unreasonably or excessively during the pendency of the lease. *See Marin*, 48 So. 3d at 255-56.

Nevertheless, as the Court held in its previous order, plaintiffs do not have claims under three of these articles. First, plaintiffs do not have a claim under Civil Code article 2683(1), which requires lessees to timely tender rent, because they make no allegations that defendants failed to pay any applicable rent. Second, plaintiffs do not have a claim under Civil Code article 2683(3), which provides that a lessee is bound

10

"[t]o return the thing at the end of the lease in a condition
that is the same as it was when the thing was delivered to him,
except for normal wear and tear," because plaintiffs' complaint
indicates that the lease is still in effect, and the 2683(3)
obligation arises "only at the end of the lease," *Marin*, 48 So.
3d at 256.  Third, plaintiffs do not have a claim under Civil
Code article 2688 because it was enacted in 2005, many years
after the lease in question was executed.

Thus, the Court looks only to Civil Code articles 2683(2),
2686, and 2692, along with Mineral Code articles 11 and 122, to
evaluate plaintiffs' canal dredging allegations under the mineral
lease.  Civil Code article 2683(2) obligates a lessee to "use the
thing as a prudent administrator and in accordance with the
purpose for which it was leased."  Article 2686 provides that a
lessor may obtain damages "[i]f the lessee uses the thing for a
purpose other than that for which it was leased or in a manner
that may cause damage to the thing."  Article 2692 provides
"[t]he lessee is bound to repair damage to the thing caused by
his fault . . . and to repair any deterioration resulting from
his . . . use to the extent it exceeds the normal or agreed use
of the thing."  "These provisions continue throughout the term of
the lease and a lessor need not wait until the end of the lease
to sue a lessee for damage to his property."  *Marin*, 48 So. 3d at
256.

11

Mineral Code article 11, which states the "foundational duty of parties in a case of mineral rights," *Walton v. Burns*, --- So. 3d ---, 2013 WL 163739, at *9-10 (La. Ct. App. Jan. 16, 2013), provides generally that "[t]he owner of land burdened by a mineral right and the owner of a mineral right must exercise their respective rights with reasonable regard for those of the other." La. Rev. Stat. § 31:11. Article 122 of the Mineral Code defines this obligation more specifically in the context of mineral lessees:

> A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.

La. Rev. Stat. § 31:122. The Louisiana Supreme Court has held that Mineral Code article 122 "simply adopts the good administrator standard of La. Civ. Code art. [2683[25]], applicable to all leases, to the specific context of a mineral lease." *Castex*, 893 So. 2d at 797; *see also State v. La. Land & Exploration Co.*, 110 So. 3d 1038, 1045 & n.9 (La. 2013) ("Mineral leases are construed as leases generally, and the provisions of the Civil Code applicable to ordinary leases, when pertinent, are

---

[25]    At the time of the *Castex* opinion, Civil Code article 2710 governed the obligations of the lessee. The provision was moved to article 2683 as part of the 2004 revisions to the Civil Code. *See* La. Civ. Code art. 2683 cmt.

applied to mineral leases." (quoting *Caskey v. Kelly Oil Co.*, 737 So. 2d 1257, 1262 (La. 1999))).[26]

The question now before the Court is whether plaintiffs' new paragraph about canal dredging states a claim under the 1950 mineral lease and the applicable Civil Code and Mineral Code provisions just summarized. Civil Code article 2683(2) and Mineral Code articles 11 and 122, in essence, collectively require that mineral lessees use the leased property as a "reasonably prudent operator," or, in other words, as a "good administrator." *See Castex*, 893 So. 2d at 797; *La. Land & Exploration Co.*, 110 So. 3d at 1045-47. Plaintiffs have not plausibly alleged that defendants violated this codal duty by dredging canals, because plaintiffs do not allege facts sufficient to support the conclusion that defendants breached the applicable standard of care. Plaintiffs' only conduct allegation is that defendants failed to "us[e] the best practical techniques to prevent bank slumping, erosion, and saltwater intrusion." But reasonable prudence is not synonymous with "best practices." *Cf.* Ewans v. Wells Fargo Bank, N.A., 389 F. App'x 383, 390 (5th Cir. 2010) (distinguishing "reasonable practices" from "best practices"). More importantly, plaintiffs allege no facts to

---

[26]     The Mineral Code explicitly provides that its provisions "are supplementary to those of the Louisiana Civil Code and are applicable specifically to the subject matter of mineral law." La. Rev. Stat. § 31:2. That is, the Civil Code still applies to mineral law cases, so long as its provisions do not conflict with the provisions of the Mineral Code. *See id.*

suggest that there was a reasonably feasible alternative method available for dredging and constructing canals that would have avoided the alleged land loss but that defendants chose not to use. Therefore, plaintiffs' allegation about defendants' failure to use "best practical techniques" fails to state a claim for breach of defendants' implied obligation to act as reasonably prudent operators under the mineral lease. This is not to say that no complaint could ever set forth a set of facts from which it could reasonably be inferred that a defendant had dredged canals in such a way so as to breach its implied obligation to act as a reasonable prudent operator under a mineral lease; the Court holds only that plaintiffs' complaint has failed to do so here.

Plaintiffs' new paragraph about canal dredging also fails to state a claim under article 2686, which provides that a lessor may obtain damages "[i]f the lessee uses the thing for a purpose other than that for which it was leased or in a manner that may cause damage to the thing." The lease expressly provides for dredging, so plaintiffs do not allege that defendants used the property "for a purpose other that for which it was leased" by dredging. Nor have plaintiffs alleged that defendants used the property in a manner to cause any "damage" to the property beyond those changes anticipated by the express terms of the lease. Plaintiffs allege that "numerous canals" were dredged across plaintiffs' property and that the canals have not been

14

"revegetate[d], refill[ed], clean[ed], detoxif[ied], or otherwise restore[d]."  In short, plaintiffs allege that defendants dredged canals--as the lease expressly authorized them to do--and that those canals remain.  Plaintiff's vague allegation that the dredging resulted in "degradation of the . . . property" is insufficient on its own to suggest that defendants misused the property under the terms of the lease.

As the Louisiana Supreme Court has held in an analogous context, an "express grant of the right to dredge canals constitute[s] consent to or approval of the changes necessarily incident to dredging." *Terrebonne Parish Sch. Bd. v. Castex Energy, Inc.*, 893 So. 2d 789, 800 (La. 2005).  In *Castex*, the plaintiff alleged that its "leased property consisted of coastal wetlands, and that, before the defendants' exploration activities commenced, the property had consistent vegetation and almost no surface ponds or streams." *Id.* at 793.  According to the plaintiff, defendants' dredging "altered the hydrology of the marsh and adversely affected its ecology by removing marsh terrain, creating spoil banks, and generally impairing the natural ebb and flow of tidal waters." *Id.*  The plaintiff alleged that the defendants' failure to restore the surface of the marsh caused the canals to "gradually widen[] because of erosion causing additional loss of acreage" and "severely damage[d] the ecology of [plaintiff]'s property." *Terrebonne Parish Sch. Bd. v. Castex Energy, Inc.*, 878 So. 2d 522, 526 (La.

15

Ct. App. 2004), *rev'd*, 893 So. 2d 789 (La. 2005). Nonetheless, the Louisiana Supreme Court characterized these sorts of changes as precisely the kind of "changes necessarily incident to dredging." *Castex*, 893 So. 2d at 800. By giving defendants permission to dredge canals on its property, the plaintiff had consented to the "alterations that dredging entails." *Id*. Similarly here, plaintiffs may not now point to precisely the type of "degradation" necessarily incident to dredging as evidence that defendants used their property "in a manner that may cause damage to the thing."

Nor does plaintiffs' new canal dredging paragraph state a claim under article 2692, under which defendants have a duty as co-lessees "to repair any deterioration resulting from [the lessee's] use to the extent it exceeds the normal or agreed use" of the property. All of the "deterioration" alleged by plaintiffs allegedly resulted from defendants canal dredging activities, which were expressly permitted under the lease. Although plaintiffs make a conclusory allegation "[o]n information and belief" that "the defendants exceeded the limits of their rights under the leases in connection with the dredging of such canals,"[27] they point to no provision in the lease that defendants have supposedly exceeded by dredging canals. Merely alleging that defendants dredged canals is not enough to suggest

---

[27]    R. Doc. 164 at 4.

that defendants exceeded their rights under the lease when the
lease expressly permitted defendants to dredge canals.

Because plaintiffs have not alleged that defendants used the
property unreasonably or excessively under the terms of the lease
by dredging canals, their claim for canal backfilling and
remediation under Civil Code articles 2683(2), 2686, and 2692;
Mineral Code articles 11 and 122; and the 1950 mineral lease must
fail.

2.    *1960 Servitude Agreement and Applicable Civil Code
      Suppletive Rules*

As a preliminary matter, the Court restates its holding from
its previous order that plaintiffs cannot state a claim against
Chevron under the 1960 servitude agreement or any of the codal
provisions related to servitude holders, because plaintiffs never
allege and do not attach any documentation indicating that
Chevron ever held a servitude on the property in question.

Next, having compared the allegations in plaintiffs' new
paragraph about canal dredging to the express terms of the 1960
servitude and the applicable suppletive rules provided by the
Civil Code, the Court finds that plaintiffs have not alleged that
Exxon or Humble Oil, Exxon's predecessor-in-interest, violated
the express terms of the 1960 servitude or any implied
obligations provided by the applicable suppletive rules.

When a servitude is established by contract, the extent and
mode of using the servitude is regulated by the contract. *St.*

17

*Martin v. Mobil Exploration & Producing U.S. Inc.*, 224 F.3d 402, 409 (5th Cir. 2000) (citing *Ogden v. Bankston*, 398 So. 2d 1037, 1040-41 (La. 1981)); La. Civ. Code 697.  "A written agreement is the law between the parties and must be interpreted and enforced according to its terms."  *Ryan v. S. Natural Gas Co.*, 879 F.2d 162, 164 (5th Cir. 1989) (citations omitted) (applying Louisiana law).  Indeed, "property owners have the right to establish whatever servitudes they deem proper, '. . . their power in that respect being limited only by considerations of public order . . .'"  *Ogden*, 398 So. 2d at 1040-41 (citation omitted).  Plaintiffs do not make any allegations that suggest that Exxon or Humble Oil violated the express terms of the 1960 servitude agreement.  The 1960 servitude agreement granted Humble Oil the right to dredge canals inside a contractually defined area within the Potash field.  Plaintiffs do not allege that Exxon or Humble Oil dredged canals outside of the area authorized by the servitude agreement.  Beyond specifying the area within which Humble Oil could dredge, the agreement provided no other specifications or limitations on Humble Oil's dredging rights.  It did not specify that the canals had to be maintained at any particular width, nor that they had to be dredged using "best practical techniques to prevent bank slumping, erosion, and saltwater intrusion," nor that they needed to be "revegetate[d], refill[ed], clean[ed], detoxif[ied], or otherwise restore[d]" at any point.  Therefore, the express terms

of the 1960 servitude do not support plaintiffs' claim for canal backfilling and remediation.

The Civil Code also "provides a whole host of suppletive rules that govern the relationship of parties to a servitude to the extent that [the parties]. . . do not provide otherwise" by contract. *Rose v. Tennessee Gas Pipeline Co.*, 508 F.3d 773, 778 (5th Cir. 2007). The suppletive rules potentially relevant to plaintiffs' claim for canal backfilling and remediation are as follows[28]: Under article 576, the holder of a personal servitude "is answerable for losses resulting from his fraud, default, or neglect," and under article 577, he is also "responsible for ordinary maintenance and repairs for keeping the property subject to the [servitude] in good order." He is not responsible for "extraordinary repairs, unless they have become necessary as a result of [his] fault or neglect." La. Civ. Code 577. "Extraordinary repairs are those for the reconstruction of the whole or of a substantial part of the property subject to the [servitude]. All others are ordinary repairs." La. Civ. Code art. 578. In addition, under the rules applicable to predial servitudes,

> [i]t is well settled in Louisiana that . . . one holding
> a servitude on another's land is bound to use that

---

[28]    The Court draws relevant suppletive rules from "rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude." La. Civ. Code art. 645; *Sharp v. Harrell*, 762 So. 2d 1119, 1122 (La. Ct. App. 2000).

> servitude in such a manner as to not unreasonably injure the rights of the owner of the servient estate. Thus, if the owner of the servitude uses it in a negligent, unauthorized or unreasonable manner, the owner of the servient estate may sue for damages.

*Rose*, 508 F.3d at 778 (citing *Stephens v. Int'l Paper Co.*, 542 So.2d 35, 39 (La. App. 2 Cir. 1989)).

Plaintiffs' new canal dredging paragraph fails to state a claim for a violation of these suppletive rules. The new paragraph does not state a claim under article 576, according to which a servitude holder "is answerable for losses resulting from his fraud, default, or neglect." Plaintiffs do not allege that Exxon or its predecessors-in-interest exhibited "fraud" or "default" in connection with the canal dredging. The closest that plaintiffs come to alleging "neglect" in connection with the canal dredging is their allegation that the canals were not designed or constructed "using the best practical techniques to prevent bank slumping, erosion, and saltwater intrusion." Yet plaintiffs have pointed to no provision in contract or law imposing a duty to use "best practical techniques" (as opposed to, for example, reasonable, feasible, or standard techniques), nor have they provided any argument as to why the failure to do so would constitute neglect.

Nor do plaintiffs allege that Exxon or its predecessors-in-interest violated article 577 by failing to perform "ordinary maintenance and repairs for keeping the property subject to the [servitude] in good order." As defined by article 578,

20

"[e]xtraordinary repairs are those for the reconstruction of the whole or of a substantial part of the property subject to the [servitude]. All others are ordinary repairs."  Plaintiffs seek damages for Exxon's alleged failure to "revegetate, refill, clean, detoxify, or otherwise restore the canals"--repairs that would require reconstruction of a substantial portion of the property and which therefore qualify as extraordinary repairs under the Civil Code.  Under article 577, Exxon is responsible for extraordinary repairs only if such repairs are necessary as a result of Exxon's or Humble Oil's "fault or neglect."  Here too, the closest plaintiffs come to alleging "fault or neglect" in connection with the canal dredging is their allegation that the canals were not designed or constructed "using the best practical techniques to prevent bank slumping, erosion, and saltwater intrusion."  Yet as just discussed, plaintiffs have pointed to no provision in contract or law imposing a duty to use "best practical techniques," nor have they provided any argument as to why the failure to do so would constitute fault or neglect.

Likewise, plaintiffs have not put forward any facts suggesting that by dredging canals Exxon or Humble Oil violated the rules applicable to predial servitudes, which bar a servitude holder from "unreasonably injur[ing] the rights of the owner of the servient estate" or using the servitude "in a negligent, unauthorized or unreasonable manner."  The conduct allegation that comes closest is, once again, plaintiffs' allegation that

defendants failed to "us[e] the best practical techniques to prevent bank slumping, erosion, and saltwater intrusion."  This allegation characterizes the relevant conduct not as negligence or unreasonableness, but as a failure to satisfy a superlative standard of care: failure to use best practices.  Plaintiffs do not allege that defendants did not use or disregarded a reasonably feasible alternative method of designing and constructing the canals.  Rather, plaintiffs' "best practical techniques" language appears to demand a higher standard of conduct from defendants than is required by the negligence/unreasonableness standard set by servitude law. Failing to use best practices is not automatically unreasonable or negligent. *See Ewans*, 389 F. App'x at 390 ("Negligence law is concerned with reasonable practices, not best practices."). Therefore, plaintiffs have not stated a claim for canal backfilling and remediation under the predial servitude rules relevant to right of use servitudes.

Because plaintiffs have not alleged that Exxon violated the express terms of the 1960 servitude agreement or any of the suppletive rules applicable to the servitude, their claim for canal backfilling and remediation under the 1960 servitude agreement and applicable suppletive rules must fail.

### B.  Strict Liability Under Louisiana Civil Code article 667

Exxon asks the Court to dismiss plaintiffs' strict liability claim against Exxon for violations of Louisiana Civil Code

article 667 that occurred before April 16, 1996.[29]  Plaintiffs
concede that they do not have a claim against Exxon for strict
liability under article 667 and agree that the Court's earlier
order set forth the correct standards governing plaintiffs' claim
against Exxon under article 667.[30]  Therefore, the Court
dismisses plaintiff's strict liability claim against Exxon under
article 667.

Chevron asks the Court to dismiss plaintiffs' claim against
Chevron under article 667 in its entirety.  Previously, the Court
dismissed plaintiffs' article 667 claim against Chevron because
plaintiffs had not alleged that Chevron had engaged in any "work"
on the property that could be considered unlawful under article
667.  Plaintiffs contend that their most recent amendment to
their complaint cures the defects in their claim against Chevron
under article 667.  Plaintiffs are incorrect.

Before the 1996 amendments to the Civil Code, article 667
provided as follows: "Although a proprietor may do with his
estate what he please, still he can not make any work on it,
which may deprive his neighbor of the liberty of enjoying his
own, or which may be the cause of any damage to him."  In 1996,
the legislature "amended article 667 to require a showing of
negligence in any claim for damages under article 667 other than

---

[29]   R. Doc. 164 at 4.

[30]   R. Doc. 178 at 14.

those caused by 'pile driving' or 'blasting with explosives.'"
*Vekic v. Wood Energy Corp.*, No. 03-1906, 2004 WL 2367732, at *4
(E.D. La. Oct. 20, 2004); *accord Yokum v. 615 Bourbon Street,
L.L.C.*, 977 So. 2d 859, 874 (La. 2008).  Article 667 now provides
as follows:

> Although a proprietor may do with his estate whatever he
> pleases, still he cannot make any work on it, which may
> deprive his neighbor of the liberty of enjoying his own,
> or which may be the cause of any damage to him. However,
> if the work he makes on his estate deprives his neighbor
> of enjoyment or causes damage to him, he is answerable
> for damages only upon a showing that he knew or, in the
> exercise of reasonable care, should have known that his
> works would cause damage, that the damage could have been
> prevented by the exercise of reasonable care, and that he
> failed to exercise such reasonable care. . . .
> Nonetheless, the proprietor is answerable for damages
> without regard to his knowledge or his exercise of
> reasonable care, if the damage is caused by an
> ultrahazardous activity. An ultrahazardous activity as
> used in this Article is strictly limited to pile driving
> or blasting with explosives.

Thus, liability under article 667 has always required three
elements: (1) a proprietor (2) who conducts "work" on his
property (3) that causes damage to his neighbor.  For actions
after 1996, a fourth element--negligence--must also be shown,
except for damages resulting from pile driving or blasting with
explosives.

Plaintiffs' amended claim against Chevron under article 667
must be dismissed because, once again, they have failed to allege
that Chevron conducted *any* operations on or near plaintiffs'
property.  Without conducting any "work," Chevron could not have
violated article 667.  Plaintiffs make a show of arguing that

24

Chevron as a lease holder may be considered a "proprietor" within
the meaning of article 667.[31]  Plaintiffs are correct, *see Inabnet
v. Exxon Corp.*, 642 So. 2d 1243, 1251 (La. 1994), but it does not
matter.  As just explained, to make out a claim under 667,
plaintiffs must allege more than that Chevron may be deemed a
"proprietor."  Plaintiffs also need to allege that Chevron, as
proprietor, made some work or conducted some activity on the
property that caused plaintiffs to suffer damages.  But
plaintiffs have not alleged that Chevron engaged in *any* "work" on
the property in question, much less "work" that could be
considered unlawful under either the former or current version of
article 667.  Therefore, plaintiffs' claim against Chevron under
article 667 must be dismissed.

### C.  Strict Liability Under Louisiana Civil Code articles 2317 and 2322

Chevron and Exxon ask the Court to dismiss again plaintiffs'
claims under Civil Code articles 2317 and 2322, which concern
premises liability.  In the Court's earlier order addressing
Chevron's and Exxon's first round of motions to dismiss, the
Court dismissed plaintiffs' premises liability claim because
plaintiffs had not alleged any facts plausibly suggesting that
the facilities that allegedly caused plaintiffs' harms contained
a "'defect' or 'ruin' that posed an unreasonable risk of harm,"
as is required to establish liability under articles 2317 and

---

[31]    R. Doc. 192.

2322.  Plaintiffs' premises liability claim fails again for a
similar reason.

Article 2317 provides that "[w]e are responsible, not only
for the damage occasioned by our own act, but for that which is
caused by the act of persons for whom we are answerable, or of
the things which we have in our custody."  Before 1996,
custodians were strictly liable under Louisiana law for injuries
caused by things in their custody.  Accordingly, to recover under
article 2317, a plaintiff had to establish only three elements:
"(1) the thing causing his damage was in the custody of the
defendant; (2) the thing had a 'defect' or a condition creating
an unreasonable risk of harm; and (3) the defective condition
caused plaintiff's injuries."  *Hebert v. Sw. La. Elec. Membership
Corp.*, 667 So. 2d 1148, 1157 (La. Ct. App. 1995) (citing *Oster v.
Dep't of Transp. & Dev.*, 582 So. 2d 1285 (La. 1991)).  In 1996,
the Louisiana legislature amended the Civil Code to impose a
negligence standard.  *Coulter v. Texaco Inc.*, 117 F.3d 909, 913
n.8 (5th Cir. 1997).  Today, in order to prevail on a custodial
liability claim under article 2317, a plaintiff must prove a
fourth element as well: that "the defendant knew or should have
known of the defect" that caused the plaintiff's injuries.
*Cormier v. Dolgencorp, Inc.*, 136 F. App'x 627, 627–28 (5th Cir.
2005) (citing La. Civ. Code. arts. 2317, 2317.1).

Article 2322 applies specifically to buildings, and provides
as follows:

26

The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

A plaintiff must plead the following elements to state a claim under article 2322: "(1) ownership of the building; (2) the owner knew or, in the exercise of reasonable care, should have known of the ruin or defect; (3) the damage could have been prevented by the exercise of reasonable care; (4) the defendant failed to exercise such reasonable care; and (5) causation." *Broussard v. State ex rel. Office of State Bldgs.*, 113 So. 3d 175, 182-83 (La. 2013). Like article 2317, article 2322 imposed liability without fault before the 1996 revisions to the Civil Code. *See Celestine v. Union Oil Co.*, 652 So. 2d 1299, 1303 (La. 1995).

Plaintiffs' current allegations are insufficient to state a claim under articles 2317 and 2322 for at least two reasons. First, plaintiffs once again fail to allege the type of "defect" or "ruin" required for liability under articles 2317 and 2322 to attach. According to plaintiffs' most recent amendment to their complaint, the oil and gas facility that allegedly caused some of plaintiffs' damages "was improperly and excessively used by the oil and gas operator defendants, was improperly maintained, and

27

contained defects in its construction."[32]  Plaintiffs' conclusory assertion that an unspecified oil and gas facility was "improperly maintained . . . and contained defects" is little more than a "formulaic recitation of the element[]" of defect required for a cause of action under articles 2317 and 2322. *Iqbal*, 556 U.S. at 678.  More importantly, plaintiffs provide no factual allegations suggesting that these alleged problems in maintenance or construction "posed an unreasonable risk of harm." The Court notes that in its last order dismissing plaintiffs' claim under articles and 2317 and 2322, it highlighted plaintiffs' failure to allege facts "plausibly suggesting that those facilities or equipment contained a 'defect' or 'ruin' that posed an unreasonable risk of harm."[33]  That plaintiffs were thus on notice of this specific deficiency in their original complaint but nonetheless again failed to plead sufficient factual allegations regarding "defect" or "ruin" in their recent amending complaint supports the Court's conclusion that plaintiffs' right to relief under articles 2317 and 2322 does not "rise . . . above the speculative level."

Second, even if plaintiffs' had adequately pleaded the element of "defect" or "ruin," plaintiffs have not alleged any facts plausibly suggesting that the harms they allegedly suffered

---

[32]    R. Doc. 164 at 6.

[33]    R. Doc. 161 at 53-54.

were caused by a "defect" or "ruin."  Allegations that the defendants had custody of facilities, that the facilities "contained" a defect, and that the facilities caused harm in the form of pollution are not enough; the harm must be *caused by* the allegedly defective condition in order for a claim under article 2317 or article 2322 to lie.  *See Cormier*, 136 F. App'x at 627-28; *Broussard*, 113 So. 3d at 182-83.  Accordingly, plaintiffs' premises liability claim may not go forward.

### D. Punitive Damages Under Former Louisiana Civil Code Article 2315.3

Finally, Exxon asks the Court to dismiss plaintiffs' claim for punitive damages under former Louisiana Civil Code article 2315.3.  The Court previously dismissed this claim because it found that plaintiffs had failed to plead facts establishing the cause of action during the time period when article 2315.3 was operative.  The Court now finds that plaintiffs have stated a claim for punitive damages as to one well that Exxon operated during the article's effective period.

During its effective period, former Louisiana Civil Code article 2315.3 provided that, "[i]n addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances." *See Corbello v. Ia. Prod.*, 850 So. 2d 686, 707 (La. 2003).

29

"Damages under 2315.3 are recoverable on a derivative basis where a plaintiff is entitled to recover tort damages." *Id.* Although the article did not define hazardous or toxic substances, the Louisiana Supreme Court has explained:

> [T]he words must be given their generally accepted meaning. LSA-C.C. art. 11. Hazardous substances are those that present substantial danger to public health or the environment. A toxic substance is a substance poisonous to living organisms. Thus, the terms "hazardous" and "toxic" refer to substances which cause injury or death to human beings and/or create an environmental hazard.

*Chustz v. J.B. Hunt Transp., Inc.*, 662 So. 2d 450, 451 (La. 1995). The provision was in effect between 1984 and 1996, and it applies to causes of action arising during that time period. *See Corbello*, 850 So. 2d at 707 n.9; *Brownell Land Co. v. Apache Corp.*, No. Civ.A. 05-322, 2005 WL 3543772, at *6 (E.D. La. Oct. 13, 2005).

Thus, to establish a claim under former article 2315.3, a plaintiff must satisfy four elements:

(1)  The defendant's conduct must be wanton or reckless;

(2)  The defendant's wanton or reckless conduct must create a danger to the public;

(3)  The defendant's wanton or reckless conduct must occur in the storage, handling, or transportation of hazardous or toxic substances; and

(4)  The plaintiff's injury must be caused by the defendant's wanton or reckless conduct.

30

*Billiot v. B.P. Oil Co.*, 645 So. 2d 604, 613 (La. 1994), *reversed on other grounds*, *Adams v. J.E. Merit Cons., Inc.*, 712 So. 2d 88 (La. 1998).

Here, plaintiffs allege that Exxon "conducted, directed, controlled or participated in various oil and gas exploration and production activities" on the property, including constructing and operating "various oil and gas facilities, including but not limited to, pits, wells, sumps, pipelines, flowlines, tank batteries, wellheads, measuring facilities, separators, and injection facilities." These facilities allegedly discharged hazardous substances into plaintiffs' property.[34] Plaintiffs also allege that defendants have disposed of oilfield wastes in "unlined earthen pits" on or near the property.[35] According to the complaint, this waste, which contains numerous toxic and hazardous substances, seeps into the surrounding area, contaminating "both surface and subsurface soils and waters." Plaintiffs allege that the resulting pollution has "permanently damaged the drinking water and other aquifers" under plaintiffs' property.[36] According to plaintiffs, the wastes deposited in the pits include naturally occurring radioactive material ("NORM")

---

[34] *Alford et al. v. Chevron U.S.A. et al.*, No. 2:13-cv-5464, R. Doc. 1-3 at 27.

[35] *Id.*

[36] *Id.* at 28.

and produced water.[37]   NORM includes, *inter alia*, radium that

becomes more concentrated when brought to the surface during oil

and gas operations.[38]   Produced water includes, *inter alia*,

radioactive substances, benzene, toxic heavy metals, and radium.[39]

Plaintiffs further allege that some of these substances are known

human carcinogens.[40]   Plaintiffs also allege that "[s]ince at

least the 1930's the defendants have known that the disposal of

oilfield wastes in unlined earthen pits inevitably results in

seepage."[41]   Finally, in their most recent amendment to the

complaint, plaintiffs add that "[t]he actions of Exxon . . . in

knowingly disposing of toxic and hazardous materials onto

petitioners' property . . . from 1984 through 1996 constitut[ed]

wanton or reckless disregard for public safety in the storage,

handling or transportation of hazardous or toxic substances."[42]

The Court finds that these allegations provide enough factual

matter to support all four elements of plaintiffs' claim under

former article 2315.3.

---

[37]   *Id.*

[38]   *Id.*

[39]   *Id.* at 27-28.

[40]   *Id.* at 28.

[41]   *Id.* at 27.

[42]   R. Doc. 164 at 7-8.

In addition, "in order to state a cause of action for exemplary damages, the plaintiff must plead facts which establish the[] cause of action during the effective period of article 2315.3." *In re Harvey Term Litig.*, 872 So. 2d 584, 586 (La. Ct. App. 1994).  In two places, plaintiffs provide information about when the alleged violations occurred.  First, plaintiffs state that Exxon's allegedly wanton and reckless handling and disposal of toxic and hazardous materials occurred "from 1984 through 1996"--former article 2315.3's operative years.[43]  Second, the Operator History of the property, which is attached to plaintiffs' complaint, provides dates of operation for two different wells operated by Humble Oil and Exxon on plaintiffs' property.[44]  Operations on well number 46753 concluded on December 28, 1973, over a decade before the Louisiana legislature enacted former Civil Code article 2315.3.[45]  "[P]unitive damages under former article 2315.3 are not available for wells that have been plugged and abandoned prior to the enactment of the article." *Guthrie v. Plains Res. Inc.*, No. 2:12 CV-1904, 2013 WL 2471670, at *11 (W.D. La. June 7, 2013).  Therefore, plaintiffs cannot recover punitive damages relating to well number 46753.  In contrast, operations on well number 93246 were permitted on

---

[43]    *Id.*

[44]    *Alford et al. v. Chevron U.S.A. et al.*, No. 2:13-cv-5464, R. Doc. 1-3 at 11.

[45]    *Id.*

33

November 14, 1962 and continued until October 23, 1985, when that well also was plugged and abandoned.[46]  There are no factual allegations or records indicating that Exxon operated any wells after October 23, 1985.  Therefore, aside from punitive damages relating to well serial number 93246 for operations that occurred during the period when article 2315.3 was in effect, plaintiffs' claims for punitive damages under 2315.3 are dismissed.


IV.   CONCLUSION

For the foregoing reasons, the Court grants Chevron's motion and dismisses plaintiffs' claim for "damages for land loss, subsidence, and the cost of backfilling of canals and other excavations" and plaintiffs' claims under Louisiana Civil Code articles 667, 2317, and 2322.

The Court grants Exxon's motion to dismiss plaintiffs' claim for "damages for land loss, subsidence, and the cost of backfilling of canals and other excavations" and plaintiffs' claims under Louisiana Civil Code articles 2317 and 2322. Plaintiffs' claim for strict liability under Louisiana Civil Code article 667 is also dismissed as to Exxon; plaintiffs' claim under article 667 will be assessed according to the standards set out in the Court's previous order.  Finally, plaintiffs may proceed with their claim for punitive damages under former

---

[46]    *Id.*

34

article 2315.3 against Exxon, but the claim is limited to damages relating to well serial number 93246 for operations that occurred during the period when article 2315.3 was in effect.  Any other claim for punitive damages against Exxon is dismissed.

All claims dismissed in this order or in the Court's previous orders are now dismissed WITH PREJUDICE.


New Orleans, Louisiana, this 12th day of January, 2015.


_____
           SARAH S. VANCE
     UNITED STATES DISTRICT JUDGE