UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CATHERINE P. ALFORD, ET AL.                CIVIL ACTION


VERSUS                                      NO:  13-5457
                                            REF: 13-5703


ANADARKO E&P ONSHORE LLC, ET AL.            SECTION: R


**ORDER AND REASONS**

Defendants Chevron U.S.A. Inc., Chevron U.S.A. Holdings, Inc., Four Star Oil and Gas Company, and Gulf Oil Corporation (collectively "Chevron"); Anadarko E&P Onshore, LLC; BP America Production Company and Pan American Petroleum Corporation (collectively "BP"); Hilcorp Energy I, L.P.; and French Gulf Coast Partners move to dismiss several of plaintiffs' claims.[1] For the following reasons, the Court grants BP's motion in part and denies it in part, and grants Chevron's, Andarko's, Hilcorp's, and French's motions.

**I.   BACKGROUND**

**A.   Procedural History**

This "legacy litigation" lawsuit centers on property that plaintiffs allegedly own and/or use in Township 21 South, Range 28 East, Plaquemines Parish, Louisiana, in the Bastian Bay

---

[1]    R. Doc. 182 (Chevron); R. Doc. 186 (Anadarko); R. Doc. 185 (BP); R. Doc. 181 (Hilcorp); R. Doc. 187 (French).

Field,[2] which defendants allegedly harmed with their oil and gas exploration and production activities.[3]  On May 3, 2013, plaintiffs brought a host of claims in Louisiana state court based on these alleged harms; defendants removed the suit to this Court several months later.[4]  The Louisiana Supreme Court refers to this type of lawsuit as "legacy litigation" because it "arise[s] from [oilfield] operations conducted many decades ago" that left "an unwanted 'legacy' in the form of actual or alleged contamination." *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 238 n.1 (La. 2010) (citing Loulan Pitre, Jr., *"Legacy Litigation" and Act 312 of 2006*, 20 Tul. Envt. L.J. 347, 348 (2007)).

The motions currently before the Court are second round motions to dismiss.  The Court issued an earlier order[5] in which it dismissed all of plaintiffs' claims against Andarko and BP except for plaintiffs' claims for breach of Andarko's and BP's implied obligations as mineral lessees under Civil Code articles 2683(2), 2686, and 2692, and Mineral Code articles 11 and 122.

---

[2]  *Alford et al. v. Anadarko E&P Onshore, LLC et al.*, No. 2:13-cv-05703, R. Doc. 1-3 at 48.

[3]  *Id.* at 47.

[4]  *Alford et al. v. Chevron U.S.A. et al.*, No. 2:13-cv-5703, R. Doc. 1.  On September 12, the Court consolidated this action with Civil Action Nos. 13-5457, *Alford, et al. v. Chevron U.S.A. Inc., et al.*, and 13-5464, *Alford, et al. v. Anadarko E&P Onshore, LLC, et al.*  R. Doc. 35.  The Court remanded the lead case, No. 13-5457, to Louisiana state court on January 6, 2014. R. Doc. 158.

[5]  *See* R. Doc. 165.

2

The order also dismissed all of plaintiffs' claims against

Chevron except for the following claims:

- Claims for breach of Chevron's implied obligations as a mineral lessee under La. Civ. Code arts. 2683(2), 2686, and 2692, and Mineral Code articles 11 and 122
- A negligence claim under La. Civ. Code art. 2315 and a claim under § 324A of the Restatement (Second) of Torts, as interpreted by Louisiana jurisprudence
- A trespass claim
- A claim under La. Civ. Code art. 667, which restricts the manner in which neighbors may use their property.

The order also dismissed all of plaintiffs' claims against

Hilcorp and French except for the following claims:

- Claims for breach of Chevron's implied obligations as a mineral lessee under La. Civ. Code arts. 2683(2), 2686, and 2692, and Mineral Code articles 11 and 122
- A negligence claim under La. Civ. Code art. 2315 and a claim under § 324A of the Restatement (Second) of Torts, as interpreted by Louisiana jurisprudence.

**B.   Defendants**

Plaintiffs have sued nine entities: (1) Anadarko E&P

Onshore, LLC; (2) BP American Production Company; (3) Chevron

U.S.A. Inc.; (4) Chevron U.S.A. Holdings, Inc.; (5) Four Star Oil

and Gas Company; (6) French Gulf Coast Partners; (7) Gulf Oil

Corporation; (8) Hilcorp Energy I, L.P.; and (9) Pan American

Petroleum Corporation.  Plaintiffs allege that some of these

entities are successors-in-interest to entities that once held

mineral interests in and/or conducted oil and gas operations in

3

the Bastian Bay Field.[6]  For the sake of clarity, the Court summarizes these alleged relationships in the following chart:

| Defendant in This Case | Alleged Predecessor(s)-in-Interest |
|---|---|
| Anadarko | • RME Petroleum Company<br>• Union Pacific Resources Company |
| BP American | • Pan American |
| Chevron U.S.A. | • Gulf Oil Corporation<br>• Tidewater Oil Company<br>• Getty Oil Company<br>• TMR Company<br>• TMRI Holdings, Inc.<br>• Chevron U.S.A. Holdings |
| Chevron U.S.A. Holdings | • Texaco Producing Inc. |
| Four Star | • Getty Oil |

Plaintiffs include several documents supporting these alleged relationships, including:

- documentation of the merger between Chevron U.S.A., Inc. and Gulf Oil;[7]

- documentation of the merger between Tidewater and Getty Oil;[8] and

- documentation reflecting that Union Pacific changed its name to RME Petroleum in 2000.[9]

---

[6]   *Alford et al. v. Anadarko E&P Onshore, LLC et al.*, No. 2:13-cv-05703, R. Doc. 1-3 at 49.

[7]   *Id.* at 140.

[8]   *Id.* at 195-96.

[9]   *Id.* at 223-26.

**C.   Current Motions to Dismiss**

At issue in these second round motions to dismiss is whether plaintiffs have successfully re-pled four claims that the Court dismissed against Chevron, Hilcorp, French, Andarko, and BP in its earlier order: (1) a claim for damages for "land loss, subsidence, and backfilling of canals;" (2) a claim that defendants are strictly liable for violations of Louisiana Civil Code articles 667, 2317, and 2322; (3) a claim for punitive damages under former Louisiana Civil Code article 2315.3; and (4) a claim under Louisiana Mineral Code article 22.  BP and Andarko also ask the Court to dismiss plaintiffs' claim against them for negligence under Louisiana Civil Code 2315, and BP asks the Court to dismiss plaintiffs' claim against it for violations of the implied obligations of mineral lessees under Louisiana Mineral Code article 11.  After examining the allegations relevant to these claims, the Court determines that plaintiffs may proceed with their claim under Mineral Code article 11 against BP. Plaintiffs' other claims against Chevron, Hilcorp, French, Andarko, and BP fail for the reasons set out in this order.

**D.   1954 Mineral Lease and Operator History**

Plaintiffs have attached to their complaint several documents relating to mineral operations in the Bastian Bay

Field.[10]  These include the following documents (defendants in this case in bold):

- an oil and gas lease on the property in the name of Tidewater Associated Oil Company (alleged predecessor-in-interest to **Chevron**), dated May 1, 1954;[11]

- various conveyances of the interests encompassed within that lease, which reflect that **French**, Union Pacific (alleged predecessor-in-interest to **Andarko**), **Chevron** U.S.A. Inc., Texaco (alleged predecessor-in-interest to **Chevron**), Getty Oil (alleged predecessor-in-interest to **Chevron**), RME Petroleum (alleged predecessor-in-interest to **Andarko**), and **Hilcorp** have held interests in the property;[12]

- a 1997 grant of leave to Union Pacific (alleged predecessor-in-interest to **Andarko**) to operate a well on the property;[13]

- a 2005 grant of leave to **Hilcorp** to operate a well on the property;[14]

- a unitization agreement concerning the property executed by Tenneco, Inc., Getty Oil (alleged predecessor-in-interest to **Chevron**), Pan American (alleged predecessor-in-interest to **BP**), Phillips Petroleum Company, Callery Properties, Inc., and Henderson Oil Company, Inc.;[15] and

- a unitization agreement concerning the property executed by Pan American (alleged predecessor-in-interest to **BP**), Tidewater (alleged predecessor-in-

---

[10]  *Id.* at 71-226.

[11]  *Id.* at 204.

[12]  *Id.* at 86-139, 212-222.

[13]  *Id.* at 71-85.

[14]  *Id.* at 209-11.

[15]  *Id.* at 141-93.

> interest to **Chevron**), and Gulf Oil (alleged
> predecessor-in-interest to **Chevron**).[16]

The Mineral lease grants the lessees the

> right and privilege to drill for, mine, extract, remove,
> and dispose of all the oil and gas deposits . . . in the
> lands leased, together with the right to construct and
> maintain thereupon all . . . buildings, plants,
> *waterways*, roads, telegraph or telephone lines,
> pipelines, reservoirs, tanks, pumping stations, or other
> structures necessary to the full enjoyment thereof.[17]

In the Court's order addressing defendants' first round

motions to dismiss, the Court held that plaintiffs had alleged no

facts plausibly suggesting that there are any other leases,

servitudes, or agreements applicable to the property besides the

1954 lease.  Plaintiffs' most recent amendment to their complaint

attaches no new documents and alleges no new facts plausibly

suggesting that any other leases, servitudes, or agreements

applicable to the property exist.  Therefore, the Court again

limits its focus to the 1954 lease granted to Tidewater.

Plaintiffs have also attached the Operator History of the

property to the complaint.[18]  That document reflects that

Tidewater (alleged predecessor-in-interest to **Chevron**), Getty Oil

---

[16]     *Id.* at 197-203. Pages 205-07 of the state court record
are unreadable.

[17]     *Id.* at 207 (emphasis added).  The copy of the lease
included in the record is illegible at page 207.  For this
excerpt, the Court relies upon a cleaner copy of the lease
provided by email by Hilcorp's counsel to the Court and to all
counsel.

[18]     *See id.* at 27.

(alleged predecessor-in-interest to **Chevron**), and Tenneco, Inc. have operated four different wells on plaintiffs' property.[19] Operations on well number 70872 were originally permitted on June 17, 1958, and concluded on August 2, 1986, when the well was plugged and abandoned.[20]  Operations on well number 73091 were originally permitted on December 4, 1958, and concluded on August 2, 1986, when the well was plugged and abandoned.[21]  Operations on well number 88536 were originally permitted on January 22, 1962, and concluded on September 18, 1976, when the well was plugged and abandoned.[22]  Operations on well number 91102 were permitted on July 9, 1962, and concluded on September 18, 1976, when the well was plugged and abandoned.[23]

## II.   LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the

---

[19]    *Id.* at 32-33.

[20]    *Id.* at 32.

[21]    *Id.*

[22]    *Id.*

[23]    *Id.* at 33.

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). But the Court is not bound to accept as true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.

A legally sufficient complaint must establish more than a "sheer possibility" that the plaintiff's claim is true.  *Id.*  It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action.  *Id.*  In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim.  *Lormand*, 565 F.3d at 257. If there are insufficient factual allegations to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the claim must be dismissed.  *Twombly*, 550 U.S. at 555.

## III.  DISCUSSION

### A.  Claim for Damages for Canal Backfilling and Remediation

Chevron, Hilcorp, French, Andarko, and BP move the Court to dismiss again plaintiffs' claim for "damages for land loss, subsidence, and the cost of backfilling of canals and other

excavations."  In the Court's earlier order addressing
defendants' first round of motions to dismiss, the Court
dismissed this claim against all five of these defendants for two
reasons.  First, the Court found that plaintiffs had not alleged
any facts indicating that their property had actually suffered
land loss or subsidence.  Second, plaintiffs did not identify and
the Court could not find any source in contract or state or
federal law imposing a duty on defendants to conduct the sort of
remediation that plaintiffs claimed was owed.

Plaintiffs now attempt to remedy the first problem by
alleging that

> [t]he defendants' oil and gas exploration and production
> activities have resulted in the dredging of numerous
> canals in, through, and across the petitioners' property.
> The canals are depicted in the aerial photographs
> attached and incorporated into the petition as Exhibit
> 'A' and "A-1."  Land loss in Bastian Bay is demonstrable.
> The dredging of canals through the petitioners' property
> has had a direct and significant impact on that property.
> . . . [T]he defendants failed to design or construct said
> canals using the best practical techniques to prevent
> bank slumping, erosion, and saltwater intrusion.  As a
> result, the defendants' oil and gas exploration and
> production activities including, but not limited to,
> dredging activities have resulted in the degradation of
> the petitioners' property.  The defendants have failed to
> revegetate, refill, clean, detoxify, or otherwise restore
> the canals on the petitioners' property.[24]

Plaintiffs have thus alleged that canals were dredged, and that
as a result, their property was "degrad[ed]" and there has been
"demonstrable" land loss.  Plaintiffs fail, however, to identify

---

[24]    R. Doc. 176 at 3-4.

10

a source in contract or state or federal law for defendants'
alleged duty to "us[e] the best practical techniques to prevent
bank slumping, erosion, and saltwater intrusion" when dredging,
or to "revegetate, refill, clean, detoxify, or otherwise restore"
the dredged canals.

In their briefing, plaintiffs point to the Louisiana Civil
Code and Mineral Code provisions governing the implied
obligations of mineral lessees as a potential source for their
claim for "damages for land loss, subsidence, and the cost of
backfilling of canals and other excavations."  The Court thus
construes plaintiffs' new paragraph about canal dredging as an
attempt to state a claim for damages for canal backfilling and
remediation under the 1954 mineral lease and the Civil Code and
Mineral Code provisions relevant to the lease.  Because the 1954
mineral lease does not provide a right to this kind of
remediation, implied or otherwise, plaintiffs' claim for canal
backfilling and remediation damages must be dismissed.
Plaintiffs' briefing also discusses the implied obligations of
servitude holders.  On this point, the Court restates its holding
from its previous order that plaintiffs cannot state a claim
against any of the defendants under the codal provisions related
to servitude holders, because plaintiffs allege no facts and
attach no documentation suggesting that any of the defendants
ever held a servitude on the property in question.

11

In Louisiana, the restoration obligation of mineral lessees is governed by the codal provisions concerning the implied obligations of lessees: Civil Code articles 2683, 2686, 2688, and 2692, which regulate the obligations of the lessor and the lessee; Mineral Code article 11, which describes the correlative rights of landowners and owners of mineral rights; and Mineral Code article 122, which concerns a mineral lessee's obligation to act as a reasonably prudent operator.  Together, these provisions establish that mineral lessees have a duty to restore property to its original condition, minus normal wear and tear, at the conclusion of the lease, and to refrain from using the property unreasonably or excessively during the pendency of the lease. *See Marin*, 48 So. 3d at 255-56.

Nevertheless, as the Court held in its previous order, plaintiffs do not have claims under three of these articles. First, plaintiffs do not have a claim under Civil Code article 2683(1), which requires lessees to timely tender rent, because plaintiffs make no allegations that defendants failed to pay any applicable rent.  Second, plaintiffs do not have a claim under Civil Code article 2683(3), which provides that a lessee is bound "[t]o return the thing at the end of the lease in a condition that is the same as it was when the thing was delivered to him, except for normal wear and tear," because plaintiffs' complaint indicates that the lease is still in effect, and the 2683(3) obligation arises "only at the end of the lease," *Marin*, 48 So.

12

3d at 256.  Third, plaintiffs do not have a claim under Civil
Code article 2688 because it was enacted in 2005, many years
after the lease in question was executed.

     Thus, the Court looks only to Civil Code articles 2683(2),
2686, and 2692, along with Mineral Code articles 11 and 122, to
evaluate plaintiffs' canal dredging allegations under the 1954
mineral lease.  Civil Code article 2683(2) obligates a lessee to
"use the thing as a prudent administrator and in accordance with
the purpose for which it was leased."  Article 2686 provides that
a lessor may obtain damages "[i]f the lessee uses the thing for a
purpose other than that for which it was leased or in a manner
that may cause damage to the thing."  Article 2692 provides
"[t]he lessee is bound to repair damage to the thing caused by
his fault . . . and to repair any deterioration resulting from
his . . . use to the extent it exceeds the normal or agreed use
of the thing."  "These provisions continue throughout the term of
the lease and a lessor need not wait until the end of the lease
to sue a lessee for damage to his property."  *Marin*, 48 So. 3d at
256.

     Mineral Code article 11, which states the "foundational duty
of parties in a case of mineral rights," *Walton v. Burns*, --- So.
3d ---, 2013 WL 163739, at *9 (La. Ct. App. Jan. 16, 2013),
provides generally that "[t]he owner of land burdened by a
mineral right and the owner of a mineral right must exercise
their respective rights with reasonable regard for those of the

other," La. Rev. Stat. § 31:11.  Article 122 of the Mineral Code
defines this obligation more specifically in the context of
mineral lessees:

> A mineral lessee is not under a fiduciary obligation to
> his lessor, but he is bound to perform the contract in
> good faith and to develop and operate the property leased
> as a reasonably prudent operator for the mutual benefit
> of himself and his lessor. Parties may stipulate what
> shall constitute reasonably prudent conduct on the part
> of the lessee.

La. Rev. Stat. § 31:122.  The Louisiana Supreme Court has held
that Mineral Code article 122 "simply adopts the good
administrator standard of La. Civ. Code art. [2683[25]], applicable
to all leases, to the specific context of a mineral lease."
*Castex*, 893 So. 2d at 797; *see also State v. La. Land &
Exploration Co.*, 110 So. 3d 1038, 1045 & n.9 (La. 2013) ("Mineral
leases are construed as leases generally, and the provisions of
the Civil Code applicable to ordinary leases, when pertinent, are
applied to mineral leases." (quoting *Caskey v. Kelly Oil Co.*,
737 So. 2d 1257, 1262 (La. 1999))).[26]

---

[25]   At the time of the *Castex* opinion, Civil Code article
2710 governed the obligations of the lessee. The provision was
moved to article 2683 as part of the 2004 revisions to the Civil
Code.  *See* La. Civ. Code art. 2683 cmt.

[26]   The Mineral Code explicitly provides that its
provisions "are supplementary to those of the Louisiana Civil
Code and are applicable specifically to the subject matter of
mineral law." La. Rev. Stat. § 31:2.  That is, the Civil Code
still applies to mineral law cases, so long as its provisions do
not conflict with the provisions of the Mineral Code.  *See id.*

The question now before the Court is whether plaintiffs' new paragraph about canal dredging states a claim under the 1954 mineral lease and the applicable Civil Code and Mineral Code provisions just summarized.  Civil Code article 2683(2) and Mineral Code articles 11 and 122, in essence, collectively require that mineral lessees use the leased property as a "reasonably prudent operator," or, in other words, as a "good administrator."  *See Terrebonne Parish Sch. Bd. v. Castex Energy, Inc.*, 893 So. 2d 789, 797 (La. 2005); *La. Land & Exploration Co.*, 110 So. 3d at 1045-47.  Plaintiffs have not plausibly alleged that defendants violated this codal duty by dredging canals, because plaintiffs do not allege facts sufficient to support the conclusion that defendants breached the applicable standard of care.  Plaintiffs' only conduct allegation is that defendants failed to "us[e] the best practical techniques to prevent bank slumping, erosion, and saltwater intrusion."  But reasonable prudence is not synonymous with "best practices."  *Cf. Evans v. Wells Fargo Bank, N.A.*, 389 F. App'x 383, 390 (5th Cir. 2010) (distinguishing "reasonable practices" from "best practices").  More importantly, plaintiffs allege no facts to suggest that there was a reasonably feasible alternative method available for dredging and constructing canals that would have avoided the alleged land loss but that defendants chose not to use.  Therefore, plaintiffs' allegation about defendants' failure to use "best practical techniques" fails to state a claim for breach

15

of defendants' implied obligation to act as reasonably prudent operators under the mineral lease. This is not to say that no complaint could ever set forth a set of facts from which it could reasonably be inferred that a defendant had dredged canals or constructed waterways in such a way so as to breach its implied obligation to act as a reasonable prudent operator under a mineral lease; the Court holds only that plaintiffs' complaint has failed to do so here.

Plaintiffs' new paragraph about canal dredging also fails to state a claim under article 2686, which provides that a lessor may obtain damages "[i]f the lessee uses the thing for a purpose other than that for which it was leased or in a manner that may cause damage to the thing." The lease expressly provides for the construction of waterways, so plaintiffs' allegation that defendants dredged canals does not indicate that defendants used the property "for a purpose other that for which it was leased." Nor have plaintiffs alleged that defendants used the property in a manner to cause any "damage" to the property beyond those changes anticipated by the express terms of the lease. Plaintiffs allege that "numerous canals" were dredged across plaintiffs' property and that the canals have not been "revegetate[d], refill[ed], clean[ed], detoxif[ied], or otherwise restore[d]." In short, plaintiffs allege that defendants dredged canals--as the lease term permitting the construction of waterways expressly authorized them to do--and that those canals

16

remain.  Plaintiff's vague allegation that the dredging resulted in "degradation of the . . . property" is insufficient on its own to suggest that defendants misused the property under the terms of the lease.

As the Louisiana Supreme Court has held in an analogous context, an "express grant of the right to dredge canals constitute[s] consent to or approval of the changes necessarily incident to dredging." *Castex* 893 So. 2d at 800.  In *Castex*, the plaintiff alleged that its "leased property consisted of coastal wetlands, and that, before the defendants' exploration activities commenced, the property had consistent vegetation and almost no surface ponds or streams." *Id.* at 793.  According to the plaintiff, defendants' dredging "altered the hydrology of the marsh and adversely affected its ecology by removing marsh terrain, creating spoil banks, and generally impairing the natural ebb and flow of tidal waters." *Id.*  The plaintiff alleged that the defendants' failure to restore the surface of the marsh caused the canals to "gradually widen[] because of erosion causing additional loss of acreage" and "severely damage[d] the ecology of [plaintiff]'s property." *Terrebonne Parish Sch. Bd. v. Castex Energy, Inc.*, 878 So. 2d 522, 526 (La. Ct. App. 2004), *rev'd*, 893 So. 2d 789 (La. 2005).  Nonetheless, the Louisiana Supreme Court characterized these sorts of changes as precisely the kind of "changes necessarily incident to dredging." *Castex*, 893 So. 2d at 800.  By giving defendants

17

permission to dredge canals on its property, the plaintiff had consented to the "alterations that dredging entails." *Id.* Similarly here, plaintiffs may not now point to precisely the type of "degradation" necessarily incident to the construction and maintenance of waterways as evidence that defendants used their property "in a manner that may cause damage to the thing."

Nor does plaintiffs' new canal dredging paragraph state a claim under article 2692, under which defendants have a duty as co-lessees "to repair any deterioration resulting from [the lessee's] use to the extent it exceeds the normal or agreed use" of the property.  All of the "deterioration" alleged by plaintiffs allegedly resulted from defendants canal dredging activities, which were expressly permitted under the lease. Although plaintiffs make a conclusory allegation "[o]n information and belief" that "the defendants exceeded the limits of their rights under the leases in connection with the dredging of such canals,"[27] they point to no provision in the lease that defendants have supposedly exceeded by dredging canals.  Merely alleging that defendants dredged canals is not enough to suggest that defendants exceeded their rights under the lease when the lease expressly permitted defendants to construct and maintain waterways.

---

[27]    *Id.* at 4.

Because plaintiffs have not alleged that defendants used the property unreasonably or excessively under the terms of the lease by dredging canals, their claim for canal backfilling and remediation under Civil Code articles 2683(2), 2686, and 2692; Mineral Code articles 11 and 122; and the 1954 mineral lease must fail.

**B.    Strict Liability Under Louisiana Civil Code article 667**

Chevron asks the Court to dismiss plaintiffs' strict liability claim against Chevron for violations of Louisiana Civil Code article 667.[28]  Plaintiffs' new complaint and briefing fail to respond to the Court's previous order, in which the Court held that while plaintiffs may maintain a cause of action against Chevron under Civil Code 667, strict liability is not the correct standard for assessing the claim.  The Court's earlier order set forth the correct standards governing plaintiffs' claim against Chevron under article 667 both before and after 1996.[29]  Therefore, the Court dismisses plaintiff's strict liability claim against Chevron under article 667.

Hilcorp, French, Andarko, and BP ask the Court to dismiss plaintiffs' claim against them under article 667 in its entirety. Previously, the Court dismissed plaintiffs' article 667 claim against these defendants because plaintiffs had not alleged that

---

[28]    R. Doc. 182-1 at 5.

[29]    R. Doc. 165 at 50-55.

19

these defendants had engaged in any "work" on the property that could be considered unlawful under article 667. Plaintiffs contend that their most recent amendment to their complaint cures the defects in their claim against Hilcorp, French, Andarko, and BP under article 667. Plaintiffs are incorrect.

Before the 1996 amendments to the Civil Code, article 667 provided as follows: "Although a proprietor may do with his estate what he please, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him." In 1996, the legislature "amended article 667 to require a showing of negligence in any claim for damages under article 667 other than those caused by 'pile driving' or 'blasting with explosives.'" *Vekic v. Wood Energy Corp.*, No. 03-1906, 2004 WL 2367732, at *4 (E.D. La. Oct. 20, 2004); *accord Yokum v. 615 Bourbon Street, L.L.C.*, 977 So. 2d 859, 874 (La. 2008). Article 667 now provides as follows:

> Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. . . . Nonetheless, the proprietor is answerable for damages without regard to his knowledge or his exercise of reasonable care, if the damage is caused by an ultrahazardous activity. An ultrahazardous activity as

20

used in this Article is strictly limited to pile driving or blasting with explosives.

Thus, liability under article 667 has always required three elements: (1) a proprietor (2) who conducts "work" on his property (3) that causes damage to his neighbor. For actions after 1996, a fourth element--negligence--must also be shown, except for damages resulting from pile driving or blasting with explosives.

Plaintiffs' amended claim against Hilcorp, French, Andarko, and BP under article 667 must be dismissed because, once again, they have failed to allege that these defendants conducted *any* operations on or near plaintiffs' property. Without conducting any "work," Hilcorp, French, Andarko, and BP could not have violated article 667. Plaintiffs make a show of arguing that Hilcorp, French, Andarko, and BP as lease holders may be considered "proprietors" within the meaning of article 667.[30] Plaintiffs are correct, *see Inabnet v. Exxon Corp.*, 642 So. 2d 1243, 1251 (La. 1994), but it does not matter. As just explained, to make out a claim under 667, plaintiffs must allege more than that defendants may be deemed "proprietors." Plaintiffs also need to allege that defendants, as proprietors, made some work or conducted some activity on the property that caused plaintiffs to suffer damages. But plaintiffs have not alleged that Hilcorp, French, Andarko, or BP engaged in *any*

---

[30]     R. Doc. 197.

21

"work" on the property in question, much less "work" that could be considered unlawful under either the former or current version of article 667.  Therefore, plaintiffs' claim against Hilcorp, French, Andarko, and BP under article 667 must be dismissed.

### C.   Strict Liability Under Louisiana Civil Code articles 2317 and 2322

Chevron, Hilcorp, French, Andarko, and BP ask the Court to dismiss again plaintiffs' claims under Civil Code articles 2317 and 2322, which concern premises liability.  In the Court's earlier order addressing defendants' first round of motions to dismiss, the Court dismissed plaintiffs' premises liability claim because plaintiffs had not alleged any facts plausibly suggesting that the facilities that allegedly caused plaintiffs' harms contained a "'defect' or 'ruin' that posed an unreasonable risk of harm," as is required to establish liability under articles 2317 and 2322.  Plaintiffs' premises liability claim fails again for a similar reason.

Article 2317 provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."  Before 1996, custodians were strictly liable under Louisiana law for injuries caused by things in their custody.  Accordingly, to recover under article 2317, a plaintiff had to establish only three elements: "(1) the thing causing his damage was in the custody of the

defendant; (2) the thing had a 'defect' or a condition creating an unreasonable risk of harm; and (3) the defective condition caused plaintiff's injuries." *Hebert v. Sw. La. Elec. Membership Corp.*, 667 So. 2d 1148, 1157 (La. Ct. App. 1995) (citing *Oster v. Dep't of Transp. & Dev.*, 582 So. 2d 1285 (La. 1991)). In 1996, the Louisiana legislature amended the Civil Code to impose a negligence standard. *Coulter v. Texaco Inc.*, 117 F.3d 909, 913 n.8 (5th Cir. 1997). Today, in order to prevail on a custodial liability claim under article 2317, a plaintiff must prove a fourth element as well: that "the defendant knew or should have known of the defect" that caused the plaintiff's injuries. *Cormier v. Dolgencorp, Inc.*, 136 F. App'x 627, 627–28 (5th Cir. 2005) (citing La. Civ. Code. arts. 2317, 2317.1).

Article 2322 applies specifically to buildings, and provides as follows:

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

A plaintiff must plead the following elements to state a claim under article 2322: "(1) ownership of the building; (2) the owner knew or, in the exercise of reasonable care, should have known of the ruin or defect; (3) the damage could have been

prevented by the exercise of reasonable care; (4) the defendant failed to exercise such reasonable care; and (5) causation." *Broussard v. State ex rel. Office of State Bldgs.*, 113 So. 3d 175, 182-83 (La. 2013). Like article 2317, article 2322 imposed liability without fault before the 1996 revisions to the Civil Code. *See Celestine v. Union Oil Co.*, 652 So. 2d 1299, 1303 (La. 1995).

Plaintiffs' current allegations are insufficient to state a claim under articles 2317 and 2322 for at least two reasons. First, plaintiffs once again fail to allege the type of "defect" or "ruin" required for liability under articles 2317 and 2322 to attach. According to plaintiffs' most recent amendment to their complaint, the oil and gas facilities that allegedly caused some of plaintiffs' damages "were improperly and excessively used by the oil and gas operator defendants, were improperly maintained, and contained defects in their construction."[31] Plaintiffs' conclusory assertion that unspecified oil and gas facilities were "improperly maintained . . . and contained defects in their construction" is little more than a "formulaic recitation of the element[]" of defect required for a cause of action under articles 2317 and 2322. *Iqbal*, 556 U.S. at 678. More importantly, plaintiffs provide no factual allegations suggesting that these alleged problems in maintenance or construction "posed

---

[31]    R. Doc. 176 at 8.

an unreasonable risk of harm."  The Court notes that in its last order dismissing plaintiffs' claim under articles 2317 and 2322, it highlighted plaintiffs' failure to allege facts "suggesting that those facilities or equipment contained a 'defect' or 'ruin' that posed an unreasonable risk of harm."[32]  That plaintiffs were thus on notice of this specific deficiency in their original complaint but nonetheless again failed to plead sufficient factual allegations regarding "defect" or "ruin" in their recent amending complaint supports the Court's conclusion that plaintiffs' right to relief under articles 2317 and 2322 does not "rise . . . above the speculative level."

Second, even if plaintiffs' had adequately pleaded the existence of a "defect" or "ruin," plaintiffs have not alleged any facts plausibly suggesting that the harms they allegedly suffered were *caused by* a "defect" or "ruin."  Allegations that the defendants had custody of facilities, that the facilities "contained" a defect, and that the facilities caused harm in the form of pollution are not enough; the harm must be *caused by* the allegedly defective condition in order for a claim under article 2317 or article 2322 to lie.  *See Cormier*, 136 F. App'x at 627–28; *Broussard*, 113 So. 3d at 182-83.  Accordingly, plaintiffs' premises liability claim may not go forward.

---

[32]    R. Doc. 165 at 57.

### D.   Negligence under Civil Code article 2315

Anadarko and BP move to dismiss again plaintiffs' claim against them under Louisiana's general negligence statute, La. C.C. art. 2315.  Andarko and BP argue that this claim should be dismissed because plaintiffs' amended complaint alleges no facts suggesting that Andarko or BP engaged in any actual conduct on the property in question.  As noted in the Court's earlier order, the Operator History attached to plaintiff's complaint suggests that the Chevron entities are the only defendants that actually conducted oil and gas exploration and production activities on plaintiffs' property.[33]  Plaintiffs do not dispute this point in their opposition to Andarko's and BP's current motions to dismiss.  Rather, they focus on the Court's holding from the earlier order that the obligations of mineral lessees under a mineral lease are indivisible.  While that holding matters for plaintiffs' contract claims under the mineral lease, it does not affect the Court's analysis of plaintiffs' tort claims.

Louisiana courts conduct a duty-risk analysis to determine whether to impose tort liability under Article 2315.  *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 632-633 (La. 2006).  Under the duty-risk analysis, a plaintiff must prove each of five

_____

[33]    *Alford et al. v. Anadarko E&P Onshore, LLC et al.*, No. 2:13-cv-05703, R. Doc. 1-3 at 32-33. The only entities listed as operators on plaintiffs' property are Tidewater, Getty Oil, and Tenneco. *Id.* Tidewater and Getty Oil are allegedly predecessors in interest to the Chevron defendants, and Tenneco is not named in the complaint.

elements: (1) the defendant had a duty to conform his conduct to a specific standard of care (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard of care (the breach element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope-of-duty element); and (5) actual damages (the damages element). *S.J. v. Lafayette Parish Sch. Bd.*, 41 So. 3d 1119, 1125 (La. 2010); *see also Knight v. Kellogg Brown & Root Inc.*, 333 F. App'x 1, 6 (5th Cir. 2009) (applying Louisiana law).

Under a duty-risk analysis, absent a defendant owing a duty to the plaintiff, there can be no actionable negligence and therefore no liability. *Lemann*, 923 So. 2d at 632-633. Whether a defendant owes a duty to another presents a question of law. *Lazard v. Foti*, 859 So. 2d 656, 659 (La. 2003). The relevant inquiry is "whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support his claim." *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (citing *Faucheaux v. Terrebonne Consolidated Government*, 615 So. 2d 289, 292 (La. 1993)). Plaintiffs' amended complaint identifies only one alleged duty that defendants allegedly owed to plaintiffs, the violation of which allegedly "proximately caused" their damages: "a duty to protect plaintiffs

and plaintiffs' property from the effects of the contamination and pollution described [in the complaint]."

In their briefing, plaintiffs suggest two possible sources for this alleged duty.  First, plaintiffs appear to argue that the mineral lease creates a duty applicable to the non-operating defendants.  They cite a Louisiana intermediate appellate court case, *Edwards v. Jeems Bayou Production Company*, 507 So. 2d 11, 13 (La. Ct. App. 1987), for the proposition that "[f]ault under [Civil Code article] 2315 encompasses the exercise of contractual rights in such a manner as to cause unreasonable property damage."  *Edwards* does not support plaintiffs' contention that the mineral lease created an additional duty applicable to the non-operating defendants.  Rather, *Edwards* simply restates the unremarkable principle that a mineral lessee has an "obligation to act reasonably" when "exercis[ing] its rights under a mineral lease"--that is, when it *actively* conducts operations under the lease.  *Edwards*, 507 So. 2d at 13.  As the Fifth Circuit has recognized, and as this Court stated in its previous order, "Louisiana courts recognize that the same acts or omissions may constitute breaches of both general duties and contractual duties, giving rise to actions in both tort and contract."  *Huggs, Inc. v. LPC Energy, Inc.*, 889 F.2d 649, 655 (5th Cir. 1989).  In other words, the same negligent act may constitute both an actionable tort and a breach of the "obligation to act

28

reasonably" when exercising one's rights under a contract.

*Edwards*, 507 So. 2d at 13.  As the *Huggs* court explained:

> Generally, where a person neglects to do what he is obligated under a contract, he has committed a passive breach of the contract. If he negligently performs a contractual obligation, he has committed active negligence and thus an active breach of the contract. A passive breach of contract warrants only an action for breach of contract; an active breach of contract, on the other hand, will also support an action in tort under La. Civ. Code art. 2315.

*Huggs*, 889 F.2d at 655.  Here, plaintiffs have not alleged that Anadarko or BP negligently performed their contractual obligations as lessees of the property because they have not alleged that Anadarko or BP operated on the property or otherwise performed any obligations at all.  Therefore, they have identified no active breach of contract by either defendant that could support an action in tort.

Next, plaintiffs argue that "defendants" are "guilty of tortious conduct by virtue of their violations of statewide and fieldwide orders and regulations," in particular Louisiana Statewide Order 29-B, which relates to oilfield operations. Plaintiffs' suggestion that Statewide Order 29-B creates a general duty applicable to the non-operator defendants is wrong for at least two reasons.

First, plaintiffs appear to suggest that a violation of Statewide Order 29-B constitutes negligence *per se*, but they cite no law to support such a proposition, and the Court's research does not yield any cases suggesting that Statewide Order 29-B can

29

establish negligence *per se*.  Of course, a "plaintiff may properly offer a statute or regulation as evidence of a defendant's negligence even when that statute or regulation cannot be used to establish negligence per se."  *Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, 713 n.22 (5th Cir. 1981) (citations omitted).  But in those instances, a regulation provides *evidence* of the general standard of care; it does not create the duty of care.

Second, even if Statewide Order 29-B may be offered as evidence of the standard of care applicable to oilfield operations, it says nothing at all about the duties of non-operators.  Plaintiffs seem to suggest that even the non-operator defendants may have had obligations under section 303 of Order 29-B, which provided that existing oil field pits needed to be lined in compliance with the order or closed in accordance with specified pit closure criteria by January 20, 1989.  Section 303 does not specify which parties are responsible for these closures, and the Court therefore examines the surrounding provisions to determine to whom section 303 was meant to apply.  Section 305 of Order 29-B provides notification and reporting requirements for *operators* of oilfield pits.  According to section 305, operators were required to provide certain information to the Office of Conservation about all existing pits by July 20, 1986.  La. Admin. Code tit. 43, pt. XIX, § 305.  For existing pits that were to be further utilized, operators were

required to provide information about the pit's location, qualities, dimensions, and liner along with certification that the pit complied with the liner and operations requirements of section 307 of the order. *Id.* For existing pits that were to be closed, operators were required to provide similar identifying information about the pit and a "plan and schedule of abandonment for closure" that complied with the closure requirements of sections 311 and 313 of the order. *Id.* Failure to comply with such a plan in a timely manner would "subject an operator to appropriate civil penalties." *Id.* (emphasis added). Section 311, one of the provisions governing pit closure, further specified that liability for pit closure could not "be transferred from an operator to the owner of the surface land(s) on which a pit is located." La. Admin. Code tit. 43, pt. XIX, § 311 (emphasis added). Thus, Order 29-B makes clear that the obligations created by the order belong to pit operators. No provision of Order 29-B suggests that mineral lessees who conducted no operations have any obligations under the order.

Because plaintiffs have pointed to no source in law for any duty that the non-operator defendants have allegedly breached, their allegations are insufficient to support a tort claim under article 2315. Plaintiffs' negligence claim under Civil Code article 2315 against Andarko and BP is dismissed.

### E.     Punitive Damages Under Former Louisiana Civil Code Article 2315.3

Chevron, Hilcorp, French, Andarko, and BP ask the Court to dismiss plaintiffs' claim for punitive damages under former Louisiana Civil Code article 2315.3.  The Court previously dismissed this claim against all five defendants because it found that plaintiffs had failed to plead facts establishing the cause of action during the time period when article 2315.3 was operative.  Plaintiffs' punitive damages claim fails again for the same reason.

During its effective period, former Louisiana Civil Code article 2315.3 provided that, "[i]n addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances." *See Corbello v. Ia. Prod.*, 850 So. 2d 686, 707 (La. 2003). "Damages under 2315.3 are recoverable on a derivative basis where a plaintiff is entitled to recover tort damages." *Id.*  Although the article did not define hazardous or toxic substances, the Louisiana Supreme Court has explained:

> [T]he words must be given their generally accepted meaning. LSA-C.C. art. 11. Hazardous substances are those that present substantial danger to public health or the environment. A toxic substance is a substance poisonous to living organisms. Thus, the terms "hazardous" and "toxic" refer to substances which cause injury or death to human beings and/or create an environmental hazard.

32

*Chustz v. J.B. Hunt Transp., Inc.*, 662 So. 2d 450, 451 (La. 1995).  The provision was in effect between 1984 and 1996, and it applies to causes of action arising during that time period.  *See Corbello*, 850 So. 2d at 707 n.9; *Brownell Land Co. v. Apache Corp.*, No. Civ.A. 05-322, 2005 WL 3543772, at *6 (E.D. La. Oct. 13, 2005).

Thus, to establish a claim under former article 2315.3, a plaintiff must satisfy four elements:

(1)   The defendant's conduct must be wanton or reckless;

(2)   The defendant's wanton or reckless conduct must create a danger to the public;

(3)   The defendant's wanton or reckless conduct must occur in the storage, handling, or transportation of hazardous or toxic substances; and

(4)   The plaintiff's injury must be caused by the defendant's wanton or reckless conduct.

*See Billiot v. B.P. Oil Co.*, 645 So. 2d 604, 613 (La. 1994), *reversed on other grounds*, *Adams v. J.E. Merit Cons., Inc.*, 712 So. 2d 88 (La. 1998).

In addition, "in order to state a cause of action for exemplary damages, the plaintiff must plead facts which establish the[] cause of action during the effective period of article 2315.3."  *In re Harvey Term Litig.*, 872 So. 2d 584, 586 (La. Ct. App. 1994).  Here, plaintiffs do not provide factual allegations to support the conclusion that any of the defendants conducted

33

operations in violation of article 2315.3 during the article's operative period. As stated earlier, plaintiffs do not allege any actions by any of the defendants other than Chevron. As to Chevron, plaintiffs allege that "the actions of Tidewater Oil Company and Getty Oil Company (predecessors-in-interest to Chevron USA Inc.) . . . from 1984 through 1996"--former article 2315.3's operative years--"constitutes wanton or reckless disregard for public safety in the storage, handling or transportation of hazardous or toxic substances."[34] The Operator History of the property, which is attached to plaintiffs' complaint, provides dates of operation of four different wells operated by Tidewater and Getty (alleged predecessors-in-interest to Chevron) and Tenneco on plaintiffs' property.[35] Operations on well numbers 88536 and 91102 concluded on September 18, 1976, nearly a decade before the Louisiana legislature enacted former Civil Code article 2315.3.[36] "[P]unitive damages under former article 2315.3 are not available for wells that have been plugged and abandoned prior to the enactment of the article." *Guthrie v. Plains Res. Inc.*, No. 2:12 CV-1904, 2013 WL 2471670, at *11 (W.D. La. June 7, 2013). Therefore, plaintiffs cannot recover punitive damages relating to well numbers 88536 or 91102. In contrast,

---

[34]    R. Doc. 176 at 9.

[35]    *Alford et al. v. Anadarko E&P Onshore, LLC et al.*, No. 2:13-cv-05703, R. Doc. 1-3 at 32-33.

[36]    *Id.*

operations on well number 70872 were originally permitted on June 17, 1958, and continued until August 2, 1986, and operations on well number 73091 were originally permitted on December 4, 1958, and continued until August 2, 1986.[37]  The Operator History reveals, however, that operations on both wells transferred to Tenneco in 1982, two years before the Louisiana legislature enacted former Civil Code article 2315.3.[38]  There are no factual allegations or records indicating that Tidewater, Getty, or Chevron conducted any operations on plaintiffs' property after 1982.  Because  plaintiffs have failed to plead facts establishing the cause of action during the time period when article 2315.3 was operative, plaintiffs' claims for punitive damages under 2315.3 are dismissed.

**F.   Mineral Code Article 22**

Chevron, Hilcorp, French, Andarko, and BP ask the Court to dismiss again plaintiffs' claim under Mineral Code article 22, which concerns the rights and obligations of a mineral servitude owner.  None of the facts alleged in plaintiffs' complaint or documents attached to plaintiffs' complaint suggests that any defendant ever held a mineral servitude on the property in question.  Thus, plaintiffs cannot state a claim against any of the defendants under the codal provisions governing the

---

[37]     *Id.* at 32, 35 & 38.

[38]     *Id.*

obligations of servitude holders. *See, e.g.*, *Walton*, --- So. 3d
---, 2013 WL 163739, at *9-11 (noting that Mineral Code article
22, entitled "Certain rights and obligations of the mineral
servitude owner," is, by its express terms, applicable only to
mineral servitude holders).

### G.  Mineral Code Article 11

Finally, BP moves the Court to dismiss plaintiffs' claim
against it under Mineral Code article 11.  Mineral Code article
11 provides generally that "[t]he owner of land burdened by a
mineral right and the owner of a mineral right must exercise
their respective rights with reasonable regard for those of the
other."  La. Rev. Stat. § 31:11.  As discussed above, Mineral
Code article 11, together with Civil Code article 2683(2) and
Mineral Code article 122, in essence, collectively require that
mineral lessees use the leased property as a "reasonably prudent
operator." *See Castex*, 893 So. 2d at 797; *La. Land & Exploration
Co.*, 110 So. 3d at 1045-47.  BP argues for the first time that it
*never* held an interest in the 1954 mineral lease or any other
lease with plaintiffs and that therefore it cannot be held liable
under a lease or any of the implied obligations applicable to
mineral lessees.  If BP is correct, then there would be grounds
for dismissing not only plaintiffs' claim under Mineral Code
article 11 but also all of plaintiffs' remaining claims against
BP.  Because the documents currently before the Court are

insufficient for the Court to determine whether BP is correct, the Court denies BP's motion at this time.

The Court has reviewed the 1954 mineral lease and the other documents attached to plaintiffs' complaint that relate to mineral operations in the Bastian Bay field. Neither BP nor its alleged predecessor-in-interest, Pan American, appears on the 1954 mineral lease or in any of the instruments transferring ownership of mineral rights under the lease. The only documents before the Court in which Pan American, BP's alleged predecessor-in-interest, appears are two unitization agreements involving the Bastian Bay field. Plaintiffs allege that the documents attached to their complaint "describe[] the defendants' relationships to each other, to the wells, and to the property over time." Taking plaintiffs' allegations as true, the Court finds that while the unitization agreements do not prove that Pan American was a leaseholder of the property at issue, neither do they refute plaintiffs' allegation that Pan American once held an interest in the property. Indeed, one of the unitization agreements, dated January 21, 1960, includes a certification from the State Mineral Board indicating the Board's approval of "the unitization of land owned by the State of Louisiana *under lease to Pan American Petroleum Corporation*, *et al.*, in the unitized area."[39] Whether plaintiffs' property was part of the "land . . . under lease to

---

[39]    *Id.* at 203 (emphasis added).

Pan American . . . in the unitized area" is a question better suited to summary judgment or trial than a motion to dismiss. Therefore, the Court denies BP's motion to dismiss plaintiffs' claim against it under Mineral Code article 11.

## IV.   CONCLUSION

For the foregoing reasons, the Court grants Chevron's, Hilcorp's, French's, Andarko's, and BP's motions to dismiss, with the exception of BP's motion to dismiss plaintiffs' claim against it under Mineral Code article 11.  Plaintiffs may proceed with their claim under Mineral Code article 11 against BP.

Thus, the Court dismisses the following four claims against all five defendants: (1) plaintiffs' claim for "damages for land loss, subsidence, and the cost of backfilling of canals and other excavations," (2) plaintiffs' strict liability claim under Louisiana Civil Code articles 2317 and 2322; (3) plaintiffs' punitive damages claim under former Louisiana Civil Code article 2315.3; and (4) plaintiffs' claim under Mineral Code article 22. In addition, plaintiffs' claim against Hilcorp, French, Andarko, and BP under Louisiana Civil Code article 667 is dismissed in its entirety.  The Court also dismisses plaintiffs' claim against Chevron for *strict liability* under article 667; plaintiffs' claim against Chevron under article 667 will be assessed according to the standards set out in the Court's previous order.   Finally,

38

plaintiffs' negligence claim under Louisiana Civil Code article 2315 is dismissed as to Andarko and BP.

All claims dismissed in this order or in the Court's previous order are now dismissed WITH PREJUDICE.

New Orleans, Louisiana, this 4th day of February, 2015.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE